BREEDING *v.* STATE

[No. 251, September Term, 1958.]

*Decided June 8, 1959.*

The cause was argued before Brune, C. J., and Henderson, Hammond and Prescott, JJ.

*Marvin H. Smith* for the appellant.

*Stedman Prescott, Jr., Deputy Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General,* and *James Owen Knotts, State's Attorney for Caroline County,* on the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

The appellant was indicted for the murder of Ruth Ellen Cannon on or about June 28, 1958. He was tried before three judges, sitting without a jury, convicted, and sentenced to life imprisonment. The chief question presented is whether the evidence supports the conviction.

Mrs. Cannon was last seen by her husband at about 12:35 P.M. on Saturday, June 28, when he left home, after lunch, to return to work. When he came back about 5 P.M. she was missing. The slacks and blouse she had been wearing when he left were found folded on her bed. Two buttons had been torn from the blouse, and a torn brassiere was inside the blouse. He first assumed that she had gone to visit her family, or friends. He alerted the police about 1 A.M. of the following day.

Mrs. Cannon's body was found in a wooded area at about 3 P.M. on Monday, June 30. When found, the body was clad in blue shorts, white blouse and white shoes or sandals. The spot where the body was found was about 600 feet from a dirt road that runs parallel to State Route 404, at a point about 1½ miles from the Delaware state line. A police officer testified that it would be difficult, if not impossible, to carry the body to the spot where it was found, because of the thickness of the underbrush. A medical examination fixed the probable time of death at from 9 A.M. Sunday morning to 9 A.M. Monday morning. The cause of death was strangulation by means of a strip of cloth torn from the victim's blouse, which remained around her neck and exactly fitted a groove around her neck. A shorter strip of the same cloth was found lying to the left of the body, which was face downward. There were also signs of violence, consisting of hemorrhages in the region of the left

eye, and a fracture of the skull in the back of the head, which occurred not more than one-half hour before death, in the opinion of the medical examiner. These blows were sufficient to cause unconsciousness, but not death because the bleeding continued. The bare legs of the victim showed numerous scars and abrasions, probably due to brambles. She had a bruise on the inside of her thigh. It was the opinion of the medical examiner that she had not been raped, and he found no evidence of recent sexual intercourse. Some blueberries were found in her stomach, which had been eaten about 6 hours prior to death. She was four months pregnant.

Breeding, a young married man with several children, owned a two-toned 1953 Ford, colored pink and gray. He left his home about 7:30 A.M. Saturday morning. He went to the home of his cousin, a married woman, and tried to get her to go out with him, but she refused. He told her he "wanted a woman, and was going to have one, or else." He drove around, stopping at various taverns for beer, and at the homes of various girls, whom he tried to date. At one tavern he picked up a male companion, who rode with him but finally became hopelessly drunk and was left on the roadside. Breeding told this companion he wanted a woman, and made certain phone calls and one stop, without success. The stop was at the home of a Miss Hill, who testified that Breeding was sober, but the companion, Wissman, was so drunk as to be incoherent. This was about 2 P.M. Wissman testified he awakened between 4 and 6 P.M. lying alongside a side road, not far from the Cannon home. A passing motorist took him to Denton, where he was seen by a number of people attending the chicken festival there.

At about 3 P.M. Wayne Geisel, a milk truck driver, drove past the Cannon home and saw a pink and gray Ford parked there with its hood up and doors open. About 15 minutes later, when he drove by on his return, he saw the same car drive up the driveway and stop by the porch. When he looked again, he saw Mrs. Cannon entering the house, and a man whom he later identified as Breeding following her. About 4 P.M. Cloyd Geisel saw a pink and gray car back out of the Cannon drive. Mrs. Geisel also saw the car back out, and fixed the

time as about 4 P.M. Mrs. Ellwanger also saw a car answering the same description go past her home, going in the direction of the Cannon home. Between 5 and 6 P.M. Mrs. Charlotte Smith and her daughter, Judy, aged 16, saw the car go past their home in Delaware, and identified it as Breeding's. They knew the car, and Breeding, from his prior visits to their filling station. The driver, however, crouched down behind the wheel as it passed. There was a woman in the car, with red or dark brown hair, whom they were both sure was not Mrs. Breeding.

Breeding did not return to his home on the night of June 28, 1958. He told police, and testified when he took the stand, that he was too drunk to know what he was doing from the time he was drinking beer with Wissman until he awakened at about 12 noon on Sunday, June 29, in his car, parked in school grounds about a mile from his home. He claims that his only recollection is that he danced with a woman at a beer tavern sometime during the evening. He denied that he had ever seen Mrs. Cannon. He also remembered stopping at some house during the previous afternoon to fill his radiator with water.

At about 2 P.M. Sunday afternoon he drove up to the home of his uncle, Richard Smith, and sat in his car until about 4 P.M., listening to the radio, when his wife came there. He then drove home, and burned a pair of coveralls and the back seat cover of his car, claiming that he had "messed it up" during the night. He scattered the ashes in the barnyard. As police cars arrived at his home late Sunday night, he fled into the woods. During the next day, he crawled up to his uncle's hog pen, and received cigarettes and water. His uncle asked him what he had done, and his reply was given as "nothing," or "I can't tell you" or "Ain't going to tell you," or something like that. On redirect examination, the witness testified that Breeding said: "I can't tell you" or "I ain't going to tell you." In spite of his uncle's admonitions to give himself up, he fled again into the woods, and was captured in Delaware some three weeks later.

There was testimony from a negro man, Miller, and his wife, that they saw a pink and gray car parked on the side of a dirt

road facing into a wooded area directly across the road from a house where the accused had formerly lived. (Miller, an itinerant vegetable picker, had only recently moved into this house on the 26th or 27th.) They fixed the time as about 2 P.M. on Sunday. They told the police about seeing this car when the police came to see them Monday morning. A police officer testified that at about 9:30 A.M. he found tire marks at the place indicated by Miller, which corresponded to the tires on Breeding's car. He made drawings of the tire marks on the road. The four tires showed varying degrees of wear. One was "bald," and one was worn on the side, from the wheel being out of line. They exactly matched the tire marks left by Breeding's car, which the police impounded. The body was not found until later, after a party had been formed to search the wooded area. The body was found in an area that had been considerably trampled or mashed down, in a circle. There was a slight path, or animal track, near the body, but not leading to the road. The woods were thick with briars and undergrowth in some places, open in others. There was an abandoned sawmill in the vicinity.

The State also produced expert testimony that a fingerprint, matching that of Mrs. Cannon in at least five characteristics, was found on the window, or airvent, on the right side of Breeding's car, and that a reddish hair, having characteristics of that of Mrs. Cannon, was also found in the car.

As the appellant points out, the evidence is almost wholly circumstantial, but that is not a fatal objection. The inference seems almost inescapable that Mrs. Cannon, whether willingly or unwillingly, left her home Saturday afternoon in the company of Breeding, and in his car. Sometime during the morning or evening of the following day she met her death through manual strangulation, after a severe beating and struggle. The body was found at a point some 600 to 1000 feet from the point where Breeding's car had been parked and left tire marks. We think the triers of fact could properly draw the inference, from all the circumstances of the case, that she met her death at his hands, and that the killing was premeditated and with malice aforethought. The law on the subject is perfectly clear. See *Edwards v. State*, 198 Md. 132; *Chisley v. State*, 202 Md. 87;

*Grammer v. State,* 203 Md. 200; *Kier v. State,* 216 Md. 513; *Saldiveri v. State,* 217 Md. 412. Voluntary drunkenness is generally not a defense. Moreover, the triers of fact could properly find, as they did, that the accused was not drunk at the time of the murder. They were not obliged to accept his story. The cases also stress the fact that actions of an accused after the event may evidence guilty knowledge. Cf. *Shockley v. State,* 218 Md. 491.

The appellant contends that the trial court erred in permitting Captain Thompson, of the Delaware State Police, to resume the witness stand after he had heard the testimony of another witness. At the beginning of the trial, the court had granted a motion to exclude witnesses from the courtroom until after they had each testified. This ruling was strictly observed, but after Captain Thompson had testified, the State wished to recall him for the sole purpose of proving the method of custody of the impounded car of the accused. If we assume, without deciding, that this was error under Maryland Rule 737, it was certainly not prejudicial or reversible error. Cf. *Bulluck v. State,* 219 Md. 67, 71.

The appellant contends that the hair found in the Breeding car, concerning which expert evidence was offered, was not sufficiently identified. The point relates to the completeness of the chain of custody. It is sufficient to observe that the evidence of the examination by an agent of the F.B.I. came in without objection. *Hall v. State,* 213 Md. 369, 374. The same objection was raised as to the car. But we think the chain of custody was clearly shown, and there was testimony that all the usual precautions were taken. Cf. *Nixon v. State,* 204 Md. 475, where the authorities are reviewed. The question is one of reasonable probability that no tampering occurred.

The appellant contends that the evidence of the fingerprint was not sufficiently definite. The objection goes to the weight rather than to the admissibility of the evidence. See cases cited in a note, 28 A.L.R. 2d 1115, 1149; *People v. Roach,* 109 N. E. 618, 623 (N. Y.). Cf. *Debinski v. State,* 194 Md. 355; *Corens v. State,* 185 Md. 561; and *Murphy v. State,* 184 Md. 70. The objection to the testimony as to the tire marks must

fail for the same reason. 1 Wharton, *Criminal Evidence* (12th ed.) § 187; note, 23 A.L.R. 2d 112, 149.

Finally, the appellant contends that the State failed to prove that the killing took place in Caroline County or in Maryland. It is true that the State of Maryland cannot punish for a crime committed in another state. *Bowen v. State,* 206 Md. 368. But venue may be established by circumstantial evidence. The cases hold that the finding of a dead body in a particular county raises a presumption, or supports an inference, that the killing took place there. *People v. Latona,* 43 P. 2d 260, 266 (Cal.); *People v. Peete,* 202 P. 51, 64 (Cal.); *Commonwealth v. Costley,* 118 Mass. 1, 26; *Ford v. State,* 201 S. W. 2d 539, 543 (Tenn.). Cf. *Corens v. State, supra.* In the instant case, the evidence supports an inference that the killing took place in Caroline County. The physical evidence of a struggle at the place where the body was found, the presence of the two strips of cloth, and other evidence in the case, would support an inference that the killing occurred where the body was found. There was no evidence to the contrary. If the strangulation had occurred at another place, it is unlikely that a second strip torn from her blouse, which was too short to serve the purpose, would have been found near the body. We cannot hold that the triers of fact were clearly wrong in drawing the inferences they did.

*Judgment affirmed.*