BOBBY THOMAS *v.* STATE OF INDIANA.

[No. 575S135. Filed April 26, 1976.]

*Jerry W. Newman,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Wesley T. Wilson,* Deputy Attorney General, for appellee.

ARTERBURN, J.—The Appellant, Bobby Thomas, was convicted on June 27, 1974, for violating the Controlled Substances Act, Delivery of a Narcotic Drug. Sentenced to a

determinate sentence of fifteen years on August 5, 1974, the Appellant filed a Motion to Correct Errors on October 1, 1974. This motion was overruled on December 9, 1974. A Belated Motion to Correct Errors was permitted by the trial court, was filed on March 3, 1975, and was denied on March 6, 1975. The trial court subsequently ruled that the permission granted for this belated motion meant only that the motion had been timely filed and again overruled it on its merits. It is from the denial of these motions to correct errors that the Appellant presents this appeal. It has been kept viable by an extension of time to file the record granted by this court on May 29, 1975.

The evidence presented at trial revealed that on the evening of January 14, 1974, one Robert Barrow, a police informant, rode about the city of Indianapolis with police attempting to make purchases of narcotics. At about 1:15 a.m. on January 15 they drove into the parking lot of a tavern at 16th Street and Roosevelt Avenue. Police carefully searched Barrow, taking all personal belongings from his person, and handed him a ten-dollar bill.

Barrow got out of the car and entered the tavern. He approached the Appellant and asked, "Who is in order?", slang for "Who has drugs for sale?" The Appellant responded that he was in order, but that they would have to go across the street to his apartment to get the drugs. Knowing that the police officers would not see him if he went directly across the street, Barrow told the Appellant that he had to first move his car from the driveway.

Barrow left the tavern, walked out to the driveway in full view of the officers, and crossed the street. As he crossed a field on the other side of the street he was joined by the Appellant. They walked to an apartment building. The Appellant went into the building and returned several minutes later. The Appellant handed Barrow a small package wrapped in foil and was in turn handed the ten-dollar bill.

Barrow returned to the police car and handed the package

to the officers. He was again searched and his belongings returned to him. The contents of the package were later analyzed by a forensic chemist of the Indianapolis Police Department and found to be heroin.

## I.

The Appellant presents two contentions in this appeal. The first is that the illegal transaction here was the result of police entrapment and that, absent this transaction, the evidence was insufficient to sustain the verdict of the jury. More specifically, the Appellant contends that the evidence was insufficient to establish that the police had probable cause to believe the Appellant had been engaged in illegal activities before initiating the transaction.

The burden placed on the State to establish that such probable cause existed was thoroughly discussed by this court in *Smith* v. *State*, (1972) 258 Ind. 415, 281 N.E.2d 803. We wrote in that decision:

"* * * The theme emerges in the cases hereinabove cited and was ultimately clearly stated by this Court in *Walker* v. *State*, (1970) 255 Ind. 65, 262 N.E.2d 641, wherein we permitted the State to introduce hearsay testimony to show 'probable cause,' saying:

'When appellant evoked the defense entrapment he imposed upon the State the requirement of proving that it had probable cause of suspecting that the appellant was engaged in illegal conduct.' (Citing *Heath* v. *United States* [10th Cir. 1948] 169 F.2d 1007.) 262 N.E.2d at 645.

We, therefore, have clearly adopted or embraced a rule of law that before the State sets into operation a scheme to trap a particular suspect, there must be probable cause for the suspicions. * * *" 258 Ind. at 418, 281 N.E.2d at 805.

It should be stressed that in this case police did not initiate a transaction against any *particular* suspect. Rather, the police informant inquired as to who, if anyone, might be selling drugs. It was the Appellant who volunteered the information that he was doing so. It was the Appellant who

said they would have to go to his apartment to conduct the transaction. In a very real sense, it was the Appellant and not the police who initiated this transaction.

It is perhaps more analytically honest, however, to say that the transaction was indeed initiated by the State. Under facts such as we have here, however, the requirement enunciated in *Smith* v. *State* that probable cause be proven must be taken in conjunction with the general principles regarding entrapment discussed in that same decision.

"[I]f the government agents merely hold out an opportunity for the commission of the crime, and the offender takes advantage of that opportunity, he cannot complain of an entrapment, because it cannot be said that the criminal conduct was the product of the agents' creative activity." *Smith* v. *State, supra,* at 416. The evidence is clear in this case that the police informant merely provided an opportunity for the Appellant to carry out his natural propensity to commit the crime. The facts do not reveal a scheme which would implant in the mind of an innocent person the disposition to engage in illegal conduct. We thus can find no merit in the Appellant's contention.

## II.

The Appellant's second contention is that the trial court erred in admitting into evidence State's Exhibit 2, a package of heroin, on the grounds that a proper chain of custody had not been established. In the absence of this exhibit, it is contended, the verdict is not supported by sufficient evidence.

The chain of custody of the package in question is summarized in the brief of the Appellant:

"1. The defendant delivered it to the police informant Barrows on January 15, 1974.

2. Barrows gave the package to Officer Horn, I.P.D. Narcotics, at the scene on January 15, 1974.

3. Horn put the tin-foil package in a manilla envelope. Horn wrote on the envelope '16th and Roosevelt, Bobby Thomas' and all three narcotic officers initialed the en-

velope. Horn deposited the envelope in the 'narcotic drop box' in the police property room the night of January 15, 1974, which said Box is an old mail box and all narcotic officers of the Indianapolis Police Force, have a key to open.

4. Narcotics Officer Sims took the envelope out of the 'Drop Box' on January 23, 1974, carried it to the crime laboratory in the same building, and gave it to Dr. Philips for analysis.

5. Dr. Philips, I.P.D., on January 23, 1974, put the envelope in a cabinet and locked it. Only he and another chemist had a key to the cabinet.

6. Dr. Philips opened the envelope and took out a tin-foil package on February 1, 1974, and analyzed its contents. The powder was sealed in the corner of a plastic bag which along with the aluminum foil packet was heat sealed. The Doctor placed a white card in the envelope, with date February 1, 1974, case number, and name stamped on it. The Doctor placed an evidence seal in envelope. All was placed back into the manilla envelope on February 1, 1974. The envelope was replaced in the locked cabinet.

7. On March 12, 1974 Narcotics Officer Sims went to the laboratory and took the envelope back from Dr. Philips and took it to the Indianapolis Police Department vault and assigned it a shelf. The vault is a large room with two locks on it. The personnel in the property room have one key and the narcotics office has the other. Sgt. Gentry is the custodian of the key.

8. Officer Sims picked up the envelope from the vault on June 26, 1974 for trial and returned it in the afternoon.

9. Officer Sims again picked up the envelope from the vault on June 27, 1974, for trial. The said envelope, being Exhibit One for the State, and its contents being Exhibit Two (2) for the State were admitted into evidence on June 27, 1974. The enclosed tin-foil is described by the Court reporter as measuring 2″ by 1″.

Dr. Philips is the only witness to identify State's Exhibit Two (2) the tin-foil package and powder, analyzed to be heroin. Dr. Philips' identification was as follows:

'Q. Now, you said you analyzed it on February 1, 1974. Is what is marked for identification purposes as State's Exhibit 2 in the same form that the contents were in prior to your opening it up, or when you opened it up?

A. When I opened it up the contents of State's Exhibit

1 was the foil packet with the powder wrapped inside the foil.' " (page references to record omitted)

The Appellant finds the following flaws in this chronology: that the police officers failed to field examine or test the heroin; that the informant and police officers Horn and Sims failed to identify State's Exhibit 2 at trial; that there is no testimony that the envelope deposited in the "narcotic drop box" was sealed. These points raise *possibilities* of tampering, but do not preclude admission of the exhibit into evidence.

"Appellee has cited several cases the holdings of which indicate that all possibility of tampering need not be excluded; upon reasonable assurance that the exhibit has passed through the various hands in an undisturbed condition its admission is proper and any remaining doubts go to its weight only. See *People* v. *Riser* (1956), 47 Cal.2d 566, 305 P.2d 1; *Breeding* v. *State* (1959), 220 Md. 193, 151 A2d 743; *State* v. *Baines* (Mo. 1965), 394 S.W.2d 312; *Commonwealth* v. *White* (1967), 353 Mass. 409, 232 N.E.2d 335. We believe such a rule is well grounded in logic and reason." *Guthrie* v. *State*, (1970) 254 Ind. 356 at 363-364, 260 N.E.2d 579 at 584.

While the State must establish a complete chain of custody, it is not required to exclude every remote possibility of tampering. The chain of custody established here was sufficient to permit admission of the exhibit into evidence.

The judgment of the trial court is affirmed.

Givan, C.J., Hunter and Prentice, JJ., concur; DeBruler, J., dissents with opinion.

### DISSENTING OPINION

DEBRULER, J.—The informant who bought the drugs from appellant appeared and testified at trial. He testified that he and his police handlers were driving around in the early morning hours. The police, together with the informant, decided to investigate things at the tavern, because it was reputed to be a place where drugs might be available. The police and the informant did not expect to find appellant there.

In fact, appellant was not known to the officers at all. The informant, on the other hand, knew that appellant was dealing in drugs. The informant gave the facts from which we must determine whether the State carried its burden of showing probable cause to solicit appellant. He testified:

"Q. How well do you know the Defendant in this case, Bobby Thomas?

A. Not too well but I know him.

Q. When did you first meet him?

A. When I was dealing drugs.

Q. When you went into the In Crowd about 1:15 in the morning.

A. I think it was somewhere around there.

Q. Approximately how many people were in there on this particular night?

A. I don't know. I didn't pay any attention.

Q. You didn't pay no attention. You just walked in—

A. And after recognizing—

Q. And you said 'who's in order'.

A. No. After recognizing him I immediately went up—

Q. Oh, you went up to him. You didn't recognize anyone else.

A. I knew he was dealing in drugs and I knew he would know where some was.

Q. Did you know he was going to be there that night?

A. No I didn't.

Q. What was your purpose in going to the In Crowd?

A. To see if there was anybody in there dealing.

Q. What did he say to you?

A. He said he had it.

\* \* \*

Q. And you went in and saw Thomas and said 'who is in order' Now how loud did you say this?

A. Well when you are buying drugs you don't broadcast it.

Q. Well that is what I am asking you, you know, just give us an idea.

A. Just very softly."

This testimony would support the conclusion that the informer had a semblance of probable cause to believe that appellant was dealing in drugs, and that he directly solicited appellant to sell him some drugs. Appellant agreed and the sale of a single packet of heroin was made to the informant for $10.00.

It is appellant's claim on appeal, that the evidence of probable cause was insufficient, since that probable cause shown existed only in the mind of the informant and had not been communicated to the police prior to the solicitation. Appellant cites no cases to support his contention. The State argues that the officers had constructive knowledge of facts constituting probable cause, relying upon a general rule applied in civil cases that knowledge of an agent is knowledge of the principal, but citing no entrapment cases on point. In *Smith* v. *State,* (1972) 258 Ind. 415, 281 N.E.2d 803; *Walker* v. *State,* (1970) 255 Ind. 65, 262 N.E.2d 641; and *Heath* v. *U.S.,* (10th Cir. 1948) 169 F.2d 1007, it was contemplated that the "officers" or the "state" would have probable cause to suspect the target of the entrapment scheme. They do not reach this issue.

The purpose of requiring the State to establish probable cause to initiate a trap is to deter the police authorities from soliciting persons to commit crimes whom the police have no reasonable grounds to believe are engaged in unlawful activity.

In my view, the deterrent effect of this rule upon the conduct of an informant is practically nil, and therefore I would require that knowledge of facts constituting probable cause be proved to have been known by actual police officers prior to the initiation of any trap by an informant. In the first place, an officer is trained in the law and is sworn to uphold it. He, therefore, has the legal training to discern when reasonable grounds exist. The ordinary informant has no such education and is not likely to be restrained by any allegiance to the supremacy of law. More importantly, the career of an informant does not continue on after a judicial determination of no probable cause has been made in the prosecution of some case in which he has unlawfully initiated

an entrapment scheme. Officer Sims demonstrated this in his testimony explaining the three month delay in arresting appellant for this sale. He testified:

> "Q. Would you tell the court then why you did not arrest this particular subject upon the scene of this alleged crime?
>
> A. Well for the simple reason that when we was making these buys, if we had arrested him then we would have blew our whole thing, our whole investigation and informants are too hard to find. We could never have used this man again to make any more buys. We used this man to make approximately 15 or 20 more buys after this buy, you see, and we had about 15 or 20 buys before this buy.
>
> Q. Didn't you expect to ever go to court on this. You knew you had to bring him into court?
>
> A. Sure, sure.
>
> Q. So what were you really blowing?
>
> A. Well, when we came to court, like we are in court now, we no longer use him as an informant. We can't because everybody knows him."

This shows that an informant has no interest in maintaining his employment over an extended period. He gets no promotions and no pension. He knows that after his first trial, the interest of the police in using him as an informer is over, and, therefore, he need only please them in his street duties up to the time of that first trial.

It was also pointed out in testimony that while informants have no quotas to meet in making such buys, they are under pressure from the police to produce, and, if they do not, their salaries are cut off. It is highly unlikely that informants, some of whom are addicts and former dealers themselves, as is the informant in this case, and who rely upon their police pay to sustain their own habits, will use caution in determining whether what they may know about a particular person standing on a street corner, constitutes probable cause.

NOTE.—Reported at 345 N.E.2d 835.