846 A.2d 485

**Elijah Sadik PARKER**

v.

**STATE of Maryland.**

**No. 1726, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

April 8, 2004.

254

Mark Colvin (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Diane E. Keller (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before SALMON, BARBERA and SHARER, JJ.

SALMON, Judge.

Elijah Parker ("Parker") was convicted by a Frederick County jury of second degree rape and second degree assault. After sentencing, Parker noted this appeal and, *inter alia,* raises two novel questions, *viz:*

1.  Under Maryland Rule 5–802.1(d), which sets forth a hearsay exception allowing the court to admit "a statement that is one of prompt complaint of sexually assaultive behavior to which the declarant was subjected if the statement is consistent with the declarant's testimony . . . ," may the court allow the testimony as to only one such prompt complaint?

2.  Under Maryland law, can the trial court, in the exercise of its discretion, appropriately allow testimony concerning the victim's demeanor and behavior in the weeks and months after the [alleged] rape to rebut a contention that the sex was consensual?

## I.

### A. *The State's Evidence*

Elijah Parker (age seventeen) and Latissa F. ("Latissa") (age sixteen) lived in Frederick, Maryland, and dated between December 25, 2000, and the end of February 2001.[1] After their breakup, they remained friendly.

On Easter Sunday, April 15, 2001, Parker called Latissa and invited her to have dinner with him. She accepted. Parker picked up Latissa that evening at her house at approximately 6:00 p.m. Parker was accompanied by a friend named "George." Shortly thereafter, George was dropped off. Parker and Latissa drove around while they decided where to have dinner. Eventually Parker drove to the parking lot of the Burlington Coat Factory, stopped his car, and asked Latissa to get into the backseat to retrieve his book bag, which he said was under the front seat. Latissa did as requested, whereupon Parker joined her in the backseat and began kissing her. Latissa told him to stop, but he did not. She then tried to push him away, which angered Parker. He pushed back and began to curse. Parker then pinned Latissa down, pulled off her jeans and underwear, and had non-consensual vaginal intercourse with her.

After the rape, Latissa opened the car door and fell onto the pavement. Parker pulled her back into the automobile, got into the driver's seat, and started driving. Latissa dressed, as Parker drove. He warned her not to tell anyone what had occurred and said that he would hurt her again if she revealed what he had done. When Parker stopped at a traffic light, Latissa jumped out of the car and ran to a nearby Chinese restaurant, where she called the police.

At approximately 7:00 p.m., Frederick City Police Officer Heather Richter responded to Latissa's 911 call. When Officer Richter arrived at the restaurant, Latissa was crying, and her entire body was shaking.

---

1. The ages of Elijah Parker and Latissa are their ages on April 15, 2001—the date of the (alleged) rape.

Latissa immediately told Officer Richter that Parker had raped her. During questioning, Latissa was "very scared" and "continually" crying. This made it difficult for the officer to obtain further details. Nevertheless, Officer Richter learned from Latissa that the rape had occurred in the parking lot of the Burlington Coat Factory and that Parker had scratched her during the incident.

Officer Richter observed blood on Latissa's white tank top, above her breast. She also saw a scratch on the upper part of Latissa's left arm, which was bleeding.

Officer Richter stayed with Latissa for several hours. As the evening wore on, she noticed that additional scratches started to appear on Latissa's left arm "from her shoulder down to her wrist." In Officer Richter's words, "They became red and puffy as if scratched by fingernails."

Latissa was taken to the Frederick Memorial Hospital where she was seen by Kim Day, a registered nurse. Ms. Day collected Latissa's clothing, including her underwear. According to Nurse Day's testimony, the underwear was "torn on the side at the elastic." The clothing was placed in a bag, sealed, and later turned over to Officer Richter.

Latissa's grandmother, Dorothy Worrell, visited Latissa at the hospital at approximately 12:30 a.m. on April 16, 2001. During the visit, Latissa grabbed Ms. Worrell and said, "Granny, Granny, Elijah raped me." Ms. Worrell observed that Latissa's face was "bruised," and her arm was bleeding and appeared to have been scratched. Additionally, there were "red marks" on Latissa's breasts and the back of her shoulder, according to Ms. Worrell's testimony.

Latissa lived with Ms. Worrell for several weeks following the attack. In that period, her behavior changed markedly from what it had been before the Easter incident—according to Ms. Worrell. Latissa was no longer the carefree sixteen-year-old she had been previously; after Easter, she never wanted to be left alone and insisted on sleeping in Ms. Worrell's bed. Moreover, post-rape, Latissa had to be taken out of school because of her fear of Parker. Due to these

problems, Latissa was taken to the local rape crisis center. She also received counseling from her family doctor. Because she no longer felt safe in Frederick, Latissa moved to Hagerstown to stay with an aunt and then traveled to Nebraska, where she stayed with an uncle.

Some of Ms. Worrell's testimony as to Latissa's post-rape behavior also corroborated what Latissa had testified to, i.e., that after the rape, but prior to moving away, Latissa did not go back to school but instead stayed home and occupied herself by playing on the computer and watching movies.

### B. *The Defense Case*

Although Parker did not testify, his counsel presented a consent defense. His principal witness was George Pacheco, who testified that one afternoon "around Easter" in 2001, he and Parker picked up Latissa in Parker's car. Also in the car were two other friends of Parker. After driving around for about ten minutes, Parker dropped off two of the friends; Parker, Pacheco, and Latissa then went to Parker's house. According to Pacheco, Parker and Latissa went upstairs to Parker's bedroom while Pacheco stayed in the living room. After about an hour, Pacheco saw Parker and Latissa arguing as they descended the stairs.

Parker, Latissa, and Pacheco got into Parker's car at approximately 5:00 p.m. and headed toward Latissa's house to drop her off. During the trip, Parker and Latissa continued to argue, and Latissa kept opening the car door and attempting to jump out. When the car stopped at a red light near the Fredericktowne Mall, Latissa got out of the car and walked away.

Another friend of appellant's, Larry Pryor, testified that on the afternoon of April 15, 2001, he rode in a car driven by Parker for about an hour and a half. With him in the car were Latissa, Pacheco, and one Roger Childs. Eventually Parker dropped off Pryor and Childs at the apartment where Pryor's sister lived.

The defense also called Officer Richter, who testified that Latissa told her that she was walking home from a friend's house when Parker pulled up next to her about 5:30 p.m. on April 15. Latissa also told Officer Richter that she and appellant drove around in Parker's car for about an hour and a half, and that Latissa said nothing about anyone else having been in the car.

## II. DISCUSSION

### A.

■ Appellant first claims that the trial court abused its discretion in permitting Ms. Worrell, Latissa's grandmother, to testify that Latissa had told her that appellant had raped her. He maintains that Latissa's hearsay statement to Ms. Worrell was inadmissible as a prompt complaint of sexual assault because evidence had already been presented that Latissa had promptly reported the alleged rape to Officer Richter.

Appellant contends that the sole purpose of admitting testimony about a prompt complaint of sexual assault is to negate any inference that might be drawn from the victim's failure to complain immediately. Because Officer Richter's testimony served that purpose, evidence of a second prompt complaint should not have been admitted, according to appellant.

■ Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801. Generally, hearsay is inadmissible. Md. Rule 5-802. A hearsay statement may be admissible, however, under certain recognized exceptions to the rule if "circumstances provide the 'requisite indicia of trustworthiness concerning the truthfulness of the statement.'" *State v. Harrell*, 348 Md. 69, 76, 702 A.2d 723 (1997) (quoting *Ali v. State*, 314 Md. 295, 304–05, 550 A.2d 925 (1988)); *see Cassidy v. State*, 74 Md.App. 1, 8–9, 536 A.2d 666 (1988) (to be admissible, state-

ment must fall under one of the recognized exceptions to the rule against hearsay).

A hearsay exception [2] set forth in Maryland Rule 5–802.1(d) reads:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

\* \* \*

(d) A statement that is one of prompt complaint of sexually assaultive behavior to which the declarant was subjected if the statement is consistent with the declarant's testimony.

■ "In prosecutions for sex offenses, evidence of the victim's complaint, coupled with the circumstances of the complaint, is admissible as part of the prosecution's case if the complaint was made in a recent period of time after the offense. . . ." *State v. Werner*, 302 Md. 550, 563, 489 A.2d

---

**2.** Appellant refers to a prompt complaint of sexual assault as an exception to the rule against hearsay, but it sometimes is difficult to classify the complaint as hearsay or nonhearsay. In *Nelson v. State*, 137 Md.App. 402, 406, 768 A.2d 738 (2001), Judge Moylan, for the Court, opined that such a complaint "straddles an increasingly blurred line between hearsay and non-hearsay." (Footnote omitted.) Earlier, in *Cole v. State*, 83 Md.App. 279, 303 n. 7, 574 A.2d 326 (1990), Judge Moylan explained:

Although it must be noted that in its anticipatory and forestalling capacity, the complaint, traditionally nonhearsay, seems slowly to have been evolving into something that at least trenches on the borderland between nonhearsay and hearsay. The timeliness of the complaint and the circumstances under which it is made tend to establish the trustworthiness of its content. This is classically a consideration when dealing with hearsay. The admissibility, moreover, of such contextual attributes as the nature of the crime complained of, the time and place of the attack, and the identity of the assailant, are matters that seem to implicate the truth of the thing asserted. It may be, to be sure, that there is a technical though subtle distinction between supporting the happening of an event *per se* and supporting the testimonial credibility of a witness to that event. Wisely, jury instructions have never ventured into such treacherously and inevitably confusing and counter-productive considerations.

1119 (1985); *see also Cole v. State,* 83 Md.App. 279, 287, 574 A.2d 326 (1990) ("[A] victim's timely complaint of a sexual attack is admissible as part of the State's case-in-chief."). "[I]f the prosecutrix has testified to a violent assault, the fact of the making of complaint within a reasonable time under the circumstances is original evidence and may be shown to prevent the inference that the woman did in fact maintain a silence inconsistent with her narrative at the trial...." *Green v. State,* 161 Md. 75, 82, 155 A. 164 (1931); *see also* KENNETH S. BROWN, ET AL., 2 McCORMICK *ON EVIDENCE* § 272.1, at 223 (John W. Strong ed., 4th ed. 1992) ("In its origin, the theory of admissibility was to rebut any inference that, because the victim did not immediately complain, no crime had in fact occurred."). " '[T]he timely complaint has evolved as a hybrid form of anticipatory rehabilitation, as something that does not wait to respond to impeachment but instead forestalls it.' " *Nelson v. State,* 137 Md.App. 402, 415, 768 A.2d 738 (2001) (quoting *Cole,* 83 Md.App. at 289–90, 574 A.2d 326).

There are limitations, however, on what portion of the victim's prompt complaint may be repeated in front of the jury. "Although the earlier case law admitted only the bare fact that the complaint had been made, the restraints have been loosened at least to the point of admitting as well the essential nature of the crime complained of and the identity of the assailant." *Cole,* 83 Md.App. at 293, 574 A.2d 326. In *Guardino v. State,* 50 Md.App. 695, 706, 440 A.2d 1101 (1982), we said: "[I]t is established in Maryland that a complaint by a rape victim may be admitted as original evidence primarily to support the testimony of the victim as to the time, place, crime, and name of the wrongdoer." We later concluded in *Cole* that "[w]hen a timely complaint of a sexual attack is offered ... in the State's case-in-chief ... it is clear that the more narrative details of the complaint are not admissible." 83 Md.App. at 294, 574 A.2d 326.

██ Accordingly, a prompt complaint of sexual assault is subject to limitations such as 1) the requirement that the victim actually testify; 2) the timeliness of the complaint; 3)

the extent to which the reference may be restricted to the fact that the complaint was made, the circumstances under which it was made, and the identification of the culprit, rather than recounting the substance of the complaint in full detail.

*Nelson,* 137 Md.App. at 411, 768 A.2d 738.

Rule 5–802.1(d), at least if read literally, would indisputably justify the trial court's ruling in this case because the statement "Granny, Elijah raped me," was made promptly after the (alleged) assaultive act and was entirely consistent with the declarant's (Latissa's) trial testimony. The question then becomes: Should Rule 5–802.1(d) be read to impliedly require the court to allow testimony as to only the first prompt complaint of the sexual assault?

The actions of the trial judge in the case at hand closely imitate those of the trial judge in *Guardino v. State, supra.* In *Guardino,* a fifteen-year-old high school student complained that she was raped, robbed, and battered by Guardino. Following the attack, the prosecutrix told her mother, brother, and a police officer that Guardino had raped her and threatened her with harm if she went to the police. All the complaints were made within one hour of the rape. Guardino was convicted of rape, robbery, and battery. On appeal, he claimed that the trial court erred in allowing "testimony respecting what the prosecutrix said to others after the alleged rape and robbery." We held that the trial court did not abuse its discretion in admitting into evidence what the victim said to the three witnesses. The *Guardino* Court held that the evidence was admissible as a prompt complaint of a sexual assault. *Guardino,* 50 Md.App. at 706, 440 A.2d 1101. *Guardino,* however, is distinguishable from this case because it was decided prior to the effective date of Rule 5–802.1(d) and because, in *Guardino,* the appellant did not concede, as appellant does, that *the initial* prompt complaint of sexually assaultive behavior was admissible.

More recently, in *Nelson, supra,* we discussed Rule 5–802.1(d) in the context of a case where the defendant was

convicted of second degree rape, second degree sexual offense, and child abuse of his girlfriend's thirteen-year-old daughter. 137 Md.App. at 407, 768 A.2d 738. The assaultive conduct was alleged to have occurred on a Sunday morning while the victim's mother was at church. *Id.* Following the rape, the defendant left the scene of the crime (his girlfriend's residence), and shortly thereafter, the victim informed her eleven-year-old sister that the defendant had raped her. *Id.* at 408, 768 A.2d 738. We concluded that the evidence concerning what the victim said to her sister was admissible as a prompt complaint of sexual assault. *Id.* at 414, 768 A.2d 738.

Appellant argues that allowing admission of Latissa's second complaint unfairly bolstered Latissa's testimony. What was said in *Nelson* (as to a first complaint of sexual assault), bears repeating:

> The appellant argues that [the victim's] earlier out-of-court declarations were used by the State "to reinforce [the victim's] story" on the witness stand. We agree. That, of course, is precisely what the introduction of a prompt complaint of a sexual attack is intended to do. In what the appellant describes as a one-on-one credibility battle between the defendant and the victim, the legally sanctioned function of the prompt complaint of a sexual attack is to give added weight to the credibility of the victim. Apparently the evidentiary principle worked in this case exactly as it was intended to work.

*Id.* at 411, 768 A.2d 738.

In *Nelson,* the victim also made a second report of the rape the next day at school. *Id.* at 417–18, 768 A.2d 738. The admissibility of this statement to a school counselor was not properly preserved for appellate review, however. Nonetheless, Judge Moylan said in *dicta:*

> If the admissibility of that out-of-court declaration were properly before us, it seems overwhelmingly likely that we would hold it to have been admissible as a prompt complaint of a sexual attack, under precisely the same reasoning that we used to affirm the admission of [the victim's] earlier

complaint to her sister.... The only arguable difference might have been with respect to the promptness of the complaint.

The additional 24–28 hours would almost certainly, however, have no adverse effect on the admissibility of a prompt complaint of a sexual attack, whereas it might well be fatal to an excited utterance. The window of admissibility of the latter is circumscribed by the continuation of a state of excitement in the body and in the psyche of the victim. There is a glandular component. The window of admissibility of the former, by contrast, is measured by the expectation of what a reasonable victim, considering age and family involvement and other circumstances, would probably do by way of complaining once it became safe and feasible to do so. Reasonable time frames would vary with circumstances. An emotion-driven complaint to a close friend or relative, for instance, might well precede a more deliberate report to police or to medical attendants.

*Id.* at 418, 768 A.2d 738.

The thirteen-year-old victim in *Nelson, supra,* also made a third complaint regarding the assaultive behavior, this time to a sexual assault examiner, who was a registered nurse. *Id.* at 420, 768 A.2d 738. The defense did not object to the examiner's testimony, but Judge Moylan nevertheless discussed the admissibility of the third complaint:

Although it seems clear that this out-of-court declaration, just as those to [her sister] and to the school counselor, could have qualified as a prompt complaint of a sexual attack ... the appellant and the State have chosen to pitch the battle on a different field. They cast the issue of admissibility in terms of the firmly rooted exception to the Rule Against Hearsay classically referred to as a statement to a treating physician.

... [A]s a prompt complaint ... the out-of-court utterance would come in as substantive evidence. The signifi-

cance of the prompt complaint would consist largely of the fact that it was made.

*Id.* at 422, 768 A.2d 738.

Although *dicta, Nelson* is well-reasoned and convinces us that the trial judge did not misinterpret Rule 5–802.1(d). In so concluding, we cannot ignore the fact that Rule 5–802.1(d) contains no express limitation on the number of complaints made by the victim that may be admitted at trial, and we see no valid basis to engraft such an implied limitation onto the rule.

The out-of-state cases to which appellant refers us include *Nitz v. State*, 720 P.2d 55 (Alaska Ct.App.1986). In *Nitz*, the defendant was convicted of a series of sexual assaults against his step-daughter. *Id.* at 58. The victim's first complaint was made to her mother. *Id.* The victim subsequently made similar reports of defendant's conduct to a police officer, a social worker, and a physician. *Id.* at 58–59. At trial, evidence regarding all of the victim's statements were admitted. *Id.* at 59.

The Court of Appeals of Alaska held that, under that State's first complaint doctrine, which allows for the admission of the *initial* complaint, only the victim's complaint to her mother was admissible at trial. *Id.* at 62–63. *Nitz* is inapposite because the Court was not interpreting a rule or statute—it was simply expressing its view concerning the common law of Alaska. In contrast, Maryland Rule 5–802.1(d) contains no limitation similar to that contained in Alaska's common law rule.

In *State v. Samuels*, 75 Conn.App. 671, 817 A.2d 719, 723 (2003), *cert. granted*, 263 Conn. 923, 823 A.2d 1216 (2003),[3] evidence was presented that, after the victim had reported a sexual assault to the police, she reported it to two teachers, and to her therapist. Connecticut has what is known as a "constancy of accusation doctrine," which allows for admission

---

**3.** Presently, the parties in *Samuels* are awaiting an argument date in the Connecticut Supreme Court.

of complaints of sexual assault made prior to the time the victim lodges a formal complaint. *Id.* at 729. Under this doctrine, the timing of the complaint, as long as it was made before an official complaint, affects the weight of the evidence but not the admissibility. *Id.* The Appellate Court of Connecticut explained:

> [T]he point of allowing the testimony of witnesses, whose sole function is to corroborate the testimony of the victim that a complaint was made, is to act preemptively to rebut a jury's potential residual prejudice against the failure of a victim to complain promptly. *State v. Troupe*, 237 Conn. [284,] 296, 677 A.2d 917 [(1996)]. The constancy of accusation doctrine was originally meant, and has continued to serve, as a method of counterbalancing a supposed societal bias against late complaining assault victims. Practically speaking, it provided a means to verify complaints made between the time of the assault and the time of the official complaint.

*Id.* at 728.

In concluding that the complaints made after the victim reported the assault to the police were not admissible, the Appellate Court of Connecticut relied on *State v. Troupe*, 237 Conn. 284, 677 A.2d 917 (1996), and said:

> *Troupe* had the effect of narrowing the scope of the constancy of accusation doctrine as used in Connecticut. Most notably, it restricted the use of constancy testimony, allowing it for the sole purpose of corroborating the victim's testimony that a complaint had been made. [*Troupe,*] 677 A.2d [at 929.] The court also narrowed the reasoning behind the doctrine, rationalizing that it now serves only to counteract a lingering, false assumption. "[T]he scope of our current doctrine is broader than necessary to protect against the unwarranted, but nonetheless persistent, view that a sexual assault victim who does not report the crime cannot be trusted to testify truthfully about the incident." *Id.,* at [928]. If the purpose of the doctrine is to combat stereotypes held by jurors regarding nonreporting victims, once a victim has officially reported the crime to the police,

we do not believe any reasonable function can be further served by the admission of post charge constancy testimony. *Samuels,* 817 A.2d at 729.

■ Unlike Connecticut, under Maryland's common law of evidence, the admissibility of complaint of sexual assault has never depended on whether the victim had made a prior complaint to the police. More important, there is simply no such requirement contained in Maryland Rule 5–802.1(d). As explained earlier, the purpose of the exception in Maryland is to corroborate the victim's testimony, and not simply to "combat stereotypes held by jurors regarding nonreporting victims."

We hold that the trial court did not abuse its discretion in allowing Ms. Worrell to offer testimony concerning Latissa's complaint to her of appellant's sexual assault, even though Officer Richter had already offered testimony concerning a similar (and earlier) complaint made by Latissa.

## B.

Appellant next claims that the trial court abused its discretion in permitting the State to present Ms. Worrell's testimony concerning Latissa's behavior in the weeks following the incident in question. According to appellant, such testimony was too ambiguous to be relevant.

Appellant relies on several cases holding that evidence of a defendant's behavior following the charged offense was too ambiguous and equivocal to be relevant. He contends that the reasoning employed in those cases is equally applicable to the evidence of Latissa's conduct because, in appellant's view, it is not unusual for a sixteen-year-old girl to experience radical mood swings evidenced by the teen's less carefree deportment or isolation, with a focus on activities such as watching movies and playing computer games.

Appellant argues:

It is apparent from the opinions in *Hutton* [*v. State,* 339 Md. 480, 663 A.2d 1289 (1995),] and [*State v.*] *Allewalt* [, 308

Md. 89, 517 A.2d 741 (1986),] that: (1) the symptoms of PTSD [post traumatic stress disorder] are not reliable identifiers of the specific cause of the disorder, and (2) PTSD is not within the common knowledge and understanding of laypersons. If "a diagnosis of PTSD does not reliably prove the nature of the stressor," *Hutton v. State, supra,* at 493, 663 A.2d 1289, evidence of individual symptoms, such as those involved here, surely does not. Moreover, just as the causal relationship between a stressor such as rape and the coalescence of symptoms known as PTSD is beyond the understanding of laypersons without expert testimony, so too is an understanding of the causal relationship between a stressor such as rape and the individual symptoms. For these reasons, and because the evidence of [Latissa's] behavior following the alleged assault is so ambiguous and equivocal, it is irrelevant and should have been excluded.

■ Evidence is admissible if it is relevant to the issues in the case and tends to either establish or disprove them. Md. Rules 5–401 to 5–402; *Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665 (1976); *see also Johnson v. State,* 332 Md. 456, 472 n. 7, 632 A.2d 152 (1993). "Evidentiary rulings, particularly those hinging on relevance, are entrusted to the discretion of the trial judge"; an appellate court will not second-guess a decision as to the relevancy of evidence "absent a clear abuse of the trial judge's discretion." *Jeffries v. State,* 113 Md.App. 322, 339, 688 A.2d 16 (1997) (citations omitted).

In *Snyder v. State,* 361 Md. 580, 588, 762 A.2d 125 (2000), the State was permitted, over objection, to offer testimony from government witnesses regarding the defendant's conduct during the seven years following his wife's murder. A police officer testified that while the case was being investigated the defendant failed to inquire into the progress of the investigation. *Id.* In closing argument, the prosecutor urged the jury to find that the defendant's failure to inquire evidenced a guilty conscience. *Id.* at 588–89, 762 A.2d 125. The *Snyder* Court held that this evidence was too ambiguous and equivocal to be relevant. *Id.* at 594, 762 A.2d 125. The Court said:

Many of our sister states that have considered this issue have expressed their distrust of evidence of pre-arrest silence as probative of a consciousness of guilt, noting its inherently low probative value and its high potential for unfair prejudice.

In the case *sub judice,* the State does not attempt to infer consciousness of guilt from the petitioner's pre-arrest silence, its focus being on the petitioner's subsequent failure to inquire about the progress of the police investigation into his wife's murder. The relevance of the petitioner's failure to inquire depends upon whether that evidence supports four inferences: from the failure to inquire, satisfaction of the case not being solved or actively pursued; from the satisfaction of the case not being solved or actively pursued, a consciousness of guilt; from a consciousness of guilt, a consciousness of guilt of murder; and from a consciousness of guilt of murder, actual guilt of murder. We believe that, under the circumstances of this case, evidence that the defendant failed to call the police to inquire about the status of the investigation, even for seven years, is too ambiguous and equivocal to support such inferences.

At best, the admission of the evidence invites the jury to speculate. The jury is asked to presume that the petitioner's failure to inquire is probative of the absence of a loving relationship between the petitioner and his wife and then to speculate as to the connection between the petitioner's relationship with his wife and his wife's murder, assuming in the process, that the petitioner's failure to inquire is indicative of a guilty conscience. These assumptions and speculations lack probative value where, as in this case, the State has presented no testimony or evidence, from the investigating authorities or any other source, either as to the general response of family members during a murder investigation or of any specific responses or types of inquires made by members of the Snyder family in this particular case. Moreover, the State presented no evidence that the petitioner was requested by the authorities to inquire regularly and certainly, it produced no evidence that the petitioner volun-

tarily stated that he would regularly inquire. Thus, there is no evidentiary basis for the conclusion that the jury drew. *Id.* at 595–96, 762 A.2d 125 (citations omitted).

In *Thomas v. State,* 372 Md. 342, 812 A.2d 1050 (2002), evidence was admitted in the defendant's murder trial that, more than three years after the murder, the defendant resisted when, pursuant to a search warrant, the police sought to obtain a blood sample. *Id.* at 348, 812 A.2d 1050. The Court of Appeals concluded that because there was no evidence that the defendant knew that the blood sample was being sought in connection with the murder investigation, evidence that he had resisted lacked probative value. *Id.* at 358, 812 A.2d 1050. The Court explained:

> For the evidence to have value as evidence of consciousness of guilt, and then as evidence of guilt of the murder, there must be evidence to support an inference from petitioner's conduct to a consciousness of guilt for the particular crime charged. The jury should not have been permitted to draw an inference of guilt from petitioner's conduct unless the conduct was related to the murder investigation. Because there is no evidence connecting petitioner's refusal to allow the officers to draw his blood and a consciousness of guilt of the murder ..., the evidence of defendant's conduct lacks probative value and was inadmissible.

*Id.* at 357–58, 812 A.2d 1050; *see also Bedford v. State,* 317 Md. 659, 667–68, 566 A.2d 111 (1989) (evidence that officers found a four-inch piece of metal sharpened to a point during a search of the defendant in preparation for a visit off prison grounds should have been excluded because it was too equivocal and did not demonstrate a consciousness of guilt or support an inference that the defendant intended to attempt an escape; there were too many other possible reasons why the defendant could have been in possession of the item to make it probative of guilt and it could cause the jury to make other, impermissible, inferences).

■ Although evidence of a defendant's post-crime conduct was held to be inadmissible in the aforementioned cases, those

cases do not stand for the proposition that a defendant's post-crime conduct is never admissible. It is well-recognized that

> [a] person's post-crime behavior often is considered rele-vant to the question of guilt because the particular behavior provides clues to the person's state of mind. The reason why a person's post-crime state of mind may be relevant is because, as Professor Wigmore suggested, the commission of a crime can be expected to leave some mental traces on the criminal.

*Thomas,* 372 Md. at 352, 812 A.2d 1050 (citation omitted). "[R]elevant, circumstantial evidence regarding a defendant's conduct may be admissible under Md. Rule 5–403, not as conclusive evidence of guilt, but as a circumstance tending to show a consciousness of guilt." *Snyder,* 361 Md. at 593, 762 A.2d 125 (citations omitted). *See, e.g., Whittlesey v. State,* 340 Md. 30, 57–62, 665 A.2d 223 (1995) (testimony concerning an elaborate tale spun by defendant after victim's death concern-ing the defendant's possession of a knife was properly admit-ted to demonstrate that the defendant felt the need to tell a false story, which indicated his consciousness of guilt); *Hunt v. State,* 312 Md. 494, 508–09, 540 A.2d 1125 (1988) (that defendant hid out the night of the shooting, was driven to another state, and sold jewelry to purchase a bus ticket to California was properly admitted); *Wright v. State,* 312 Md. 648, 654–655, 541 A.2d 988 (1988) (evidence that defendant concealed his identity supported inference of the defendant's consciousness of guilt).

If the commission of a crime can be expected to leave some mental traces on the criminal perpetrator, surely it must also leave its mark on the victim. Although we have found no Maryland case directly on point, evidence of a victim's conduct following a sexual assault has been permitted in other states to demonstrate that the attack did occur or to show a lack of consent. *See, e.g., Street v. United States,* 602 A.2d 141, 143–44 (D.C.1992) (trial court did not abuse its discretion in admitting testimony that after the alleged rape, complainant had to be escorted to and from the bus stop, was jumpy and fearful of men on the street, had not dated since the incident,

and appeared "solemn" when the topic of sexual assault was discussed in her presence, because such evidence made it more probable that the complainant did not consent to the sexual intercourse); *Ely v. State,* 192 Ga.App. 203, 384 S.E.2d 268, 272 (1989) (testimony of victim's mother that after the crime the victim "just gets raving" and that the incident "affected [the victim's] nerves" was properly admitted as it had some evidentiary value tending to prove force and lack of consent); *People v. Williams,* 223 Ill.App.3d 692, 166 Ill.Dec. 166, 585 N.E.2d 1188, 1193 (1992) (trial court properly admitted testimony (as relevant to issue of consent) that following sexual assault the victim suffered depression, experienced panic attacks and nightmares, and received treatment from a doctor); *Simmons v. State,* 504 N.E.2d 575, 581 (Ind.1987) (trial court did not abuse its discretion in admitting testimony from family members that following rape, victim became afraid to go outside by herself, stayed at home more often, and feared for family members who went out alone as it was probative of the fact that victim had been raped); *State v. Bishop,* 240 Kan. 647, 732 P.2d 765, 774 (1987) (victim's testimony that she received counseling as a result of what happened to her was circumstantial evidence that she was raped); *State v. Dube,* 598 A.2d 742, 746 (Me.1991) ("Evidence of changes in the victim's personality and behavior immediately after the time of the reported assault tends to prove that something of a traumatic nature had in fact occurred and thus was clearly relevant to the State's case."); *State v. Seiter,* 949 S.W.2d 218, 223 (Mo.Ct.App.1997) (experts and laymen can testify about their observations concerning physical and psychological changes in the victim because such evidence helps to prove the elements of the sexual offense itself and thus may be admitted to show the offense did in fact occur); *State v. Cosey,* 873 P.2d 1177, 1181–82 (Utah Ct.App.1994) (testimony of victim's mother contrasting victim's behavior prior to the incident with that after the incident was properly admitted as "circumstantial evidence that a traumatic experience such as rape has occurred"); *State v. Shaw,* 149 Vt. 275, 542 A.2d 1106, 1107–08 (1987) (whether a sexual assault occurred was

the key question at trial and evidence of changes in the complainant's personality was material on that question). *But see State v. Alexander*, 303 S.C. 377, 401 S.E.2d 146, 148–49 (1991) (victim's testimony that, following rape, she could not sleep, lost weight, and could not concentrate at work was relevant to prove the elements of criminal sexual conduct, including the lack of consent; evidence of behavioral and personality changes tended to establish or make more or less probable that the offense had occurred, but, under the unique facts of the case, the evidence was unduly prejudicial and should have been excluded); *Wilson v. State*, 15 S.W.3d 544, 554 (Tx.Ct.App.1999) ("Evidence of a sexual assault victim's emotional trauma is not relevant at the guilt phase of the trial unless the victim's lack of consent to the assault is disputed.").

█ In the present case, appellant's defense was that the victim and he had consensual sex. The evidence of Latissa's mood and actions following the (alleged) rape demonstrated, albeit circumstantially, that Latissa had not engaged in consensual sex with her ex-boyfriend. Latissa's testimony, if believed, provided direct evidence that the changes in her behavior post-rape were due to the rape. Latissa's grandmother, of course, had no personal knowledge as to what had caused the change in Latissa's behavior. Nevertheless, from the fact that the abrupt behavioral change occurred closely on the heels of the rape, the jury could infer, legitimately, that Latissa's behavior changed due to the rape.

Appellant's assertion that the conduct of Latissa, after the Easter Sunday incident, was ambiguous and entirely consistent with the usual mood swings of teenage girls is, to say the least, debatable. If the grandmother's testimony was believed, Latissa's post-rape behavior was in no sense usual for a person of any age. The change in Latissa's behavior and mood was both prompt and dramatic. The possibility that the changes in Latissa's behavior could be attributed to the usual mood swings of teenage girls affected the weight—not the admissibility of the evidence.

As mentioned earlier, appellant refers us to *Hutton v. State,* 339 Md. 480, 663 A.2d 1289 (1995), and *State v. Allewalt,* 308 Md. 89, 517 A.2d 741 (1986), in support of his argument that evidence of posttraumatic stress disorder is inadmissible at trial. Both *Hutton* and *Allewalt* concerned the admissibility of expert testimony about posttraumatic stress disorder. In *Hutton,* the Court of Appeals concluded that "the admission of [posttraumatic stress disorder] testimony to prove sexual abuse occurred was inadmissible and clearly error because such testimony goes beyond the limits of proper expert expression." 339 Md. at 504, 663 A.2d 1289. Nonetheless, the Court noted that such evidence would be admissible for purposes other than simply to establish that the offense had occurred. *Id.* The Court said: "The evidence might be offered, for example, *to show lack of consent* or to explain behavior that might be viewed as inconsistent with the happening of the event, such as a delay in reporting or recantation by the child." *Id.* (citation omitted) (emphasis added).

In this case, the State did not prove, or attempt to prove, that Latissa suffered from posttraumatic stress disorder, nor was the admissibility of expert testimony at issue. Evidence of Latissa's behavior following the incident came only from the victim and her grandmother. We hold that trial court did not abuse its discretion in admitting evidence of the changes in Latissa's behavior post-rape.

### III.

Prior to trial, appellant alleged that the State failed to timely disclose the results of the sexual assault examination conducted at the hospital, the results of DNA testing, the serology report, that a search and seizure warrant had been executed at appellant's residence, the names of expert witnesses the State intended to call, the chain of custody for certain evidence, and the 911 tape of Latissa's call for assistance. The defense moved *in limine* to exclude all this evidence. The court granted the defendant's motion.

Shortly thereafter, the prosecutor asked the court to clarify its ruling, saying:

I understand that the Safe [Sexual Assault Forensic Examination] report was excluded, that the DNA is excluded, and the 911 tape was excluded, and I want to clarify on the Safe report if that is any and all testimony by Kim Day. She was the Safe nurse. She made some observations as to [Latissa], not only conducting the Safe report but saw her when she initially came in and gave that report. In addition, she's the one that retrieved her clothing and the State still has the full intention of introducing the clothing. I understand the defense will not stipulate to the chain of custody in that so it would be necessary to call Kim Day to testify that she did retrieve the clothing from [Latissa]. She then gave that clothing to Officer Richter so that was the basis for that inquiry.

Defense counsel responded that, even with Ms. Day's testimony, the State ran the risk of violating the court's motion *in limine* ruling. In addition, counsel opined that the State would be unable to present a complete chain of custody for the underwear recovered from Latissa because it had been sent to the lab for testing.

The trial court deferred ruling on the admissibility of Ms. Day's testimony.

During trial, without objection, Officer Richter testified that she received Latissa's underwear from Ms. Day at the hospital. The officer further testified that she did not examine the underwear; instead, she merely took custody of it and placed it in "property at the Department" from whence it was taken to the lab.

When the prosecutor inquired if Latissa had told the officer anything concerning the underwear, the court called counsel to the bench and informed defense counsel that his earlier continuing objection concerning statements made by Latissa while at the Chinese restaurant would not apply to her statements to the officer concerning her underwear. In the

ensuing discussion, Nurse Day was mentioned and defense counsel stated:

I have a problem there because it's getting into that area that you've excluded which is the reports, the testing, things like that. My problem is this. That when they hear about a nurse and a hospital, they're gonna say oh, she was examined. I wonder what evidence. Now they're not gonna hear anything about any evidence and I'm concerned that they're going to raise questions. It will raise questions and change a focus in their mind that well, maybe they didn't find anything. But my problem is that I'm also restricted by your ruling in that I can't come out and say no evidence was found. So they're also gonna raise in their minds as well, if no evidence was found why didn't the defense attorney raise that and tell us about it. So I'm having some problems with all of this circling around and touching upon the fact that there was testing or that, or that a nurse was involved. I think it's very dangerous.

The court responded, in part: "But the fact is they went to the hospital and some of these things occurred and we can't wish that away. So I'm gonna deny that."

Officer Richter then testified, over defense counsel's objection, that Latissa told her that her underwear had been ripped by appellant in the course of the rape.

Defense counsel moved to exclude Ms. Day's testimony because it (purportedly) would violate the court's ruling concerning the State's discovery violations and would raise questions in the juror's minds about medical testing of Latissa. Defense counsel also asserted that, even with Ms. Day's testimony, a complete chain of custody could not be established for the underwear.

The trial court ruled that Ms. Day's limited testimony would not violate its earlier ruling concerning the discovery violation and that appellant would not be unduly prejudiced by her testimony.

Ms. Day then testified that she was a nurse at Frederick Memorial Hospital, that she came into contact with Latissa on

the evening in question, and that she recovered torn underwear from Latissa. Over objection, the underwear was admitted into evidence.

Further testimony concerning the underwear came from Latissa, who, without objection, said that the underwear was torn during the rape. She also, without objection, identified the garment as the underwear she wore during the incident.

Appellant contends on appeal that Ms. Day's testimony was not relevant to the chain of custody for the underwear, which he claims was adequately established by Officer Richter and Latissa.

Appellant further alleges that, even assuming *arguendo,* that Ms. Day's testimony had some minimal relevance, its probative value was far outweighed by the danger of unfair prejudice because of the inferences the jury might draw when they learned that medical personnel were involved in the case. Appellant claims that this concern was realized when the jury sent a note to the court during deliberations, asking:

Can you give the arrest date for Elijah Parker? Can we have a copy of any of the police reports? Can we have a copy of the medical exam on Latissa at [the] hospital? When were the panties taken from Latissa? And what time did Latissa go to the hospital?

The court responded:

[L]adies and gentlemen, you have all of the evidence that's been presented in the trial and you're to make your decision based on the evidence you have received. You are to rely on your memory as to that evidence, but you are to make your decision based on the evidence you saw during that portion of the trial. Saw and heard. Now I hope that response, even though it doesn't give you what you asked for, I hope it responds to your question.

Appellant also contends that it was reasonable for the jurors to assume that a medical exam was performed at the hospital and that evidence of the exam would be presented by the State at trial. He further alleges that it was reasonable for

the jurors to assume that if no such evidence was presented, the defense was probably responsible for keeping it out. From this, appellant reasons that Ms. Day's testimony substantially increased the likelihood that the jury would draw this unfairly prejudicial inference.

Although Maryland Rule 5–403 allows for the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, we perceive no unfair prejudice to appellant by admission of Ms. Day's testimony. If the sex was consensual, the jury could infer that her underwear would most probably not have been ripped. This being true, it was important for the State to show what the damaged garment looked like and to prove exactly how the underwear came into the hands of the police. Thus, Nurse Day's chain-of-custody testimony was relevant. The relevance of that evidence, in our view, was not outweighed by the possibility that a juror might speculate that the defense had kept out of evidence the results of testing of the underwear. The jury could just as well have inferred that the test results were not admitted because they were inconclusive.

Appellant's present contention that Ms. Day's testimony was irrelevant because the chain of custody was sufficiently established by the testimonies of Officer Richter and Latissa is at odds with his trial position. His trial counsel argued that, even with Ms. Day's testimony, the chain of custody for the underwear was incomplete. In light of the defense's challenge to the chain of custody, the trial court did not abuse its discretion in allowing Ms. Day to testify that she recovered the torn underwear from Latissa and gave it to Officer Richter. *See generally Hawkins v. State,* 77 Md.App. 338, 347, 550 A.2d 416 (1988) ("The test Maryland courts utilize in examining the sufficiency of the chain of custody is whether there exists the 'reasonable probability' that no tampering occurred.'") (quoting *Breeding v. State,* 220 Md. 193, 199, 151 A.2d 743 (1959) (citations omitted)).

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**